IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| DIANE WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:11CV863—HEH |
| ) | |
| COMMONWEALTH OF VIRGINIA, ) | |
| STATE BOARD OF ELELCTIONS, ) | |
| ) | |
| and ) | |
| ) | |
| NANCY RODRIGUES, in her Individual ) | |
| Capacity as Secretary of the State ) | |
| Board of Elections, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION
(Granting in Part and Denying in Part Defendants' Partial Motion to Dismiss)

This matter is presently before the Court on Defendants' partial motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff Diane Williams ("Plaintiff") has sued the Commonwealth of Virginia State Board of Elections ("SBE") and Nancy Rodrigues, the Secretary of the SBE, (collectively "Defendants") alleging retaliatory discharge and race discrimination, as well as violations of state and federal whistleblower acts, the First Amendment, and Virginia public policy. The matter has been fully briefed by both parties. The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before

1

the Court, and oral argument would not aid in the decisional process. For the reasons set forth herein, the Motion will be granted in part and denied in part.

## I. STATEMENT OF FACTS

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes Plaintiff's well-pleaded allegations to be true, and views all facts in the light most favorable to Plaintiffs. *See Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Plaintiff's Complaint contains the following factual allegations.

Plaintiff began her employment with the SBE as the contracts and services coordinator in 1994, (Compl. ¶ 12), reporting directly to Reginald Wilson ("Wilson"), SBE's business manager. (*Id.* at ¶ 26.) She remained in that role until her alleged wrongful termination on April 22, 2010. (*Id.* at ¶ 58.) During the relevant period of Plaintiff's employment, Defendant Nancy Rodrigues was the appointed Secretary of the SBE. (*Id.* at ¶¶ 13–14).

According to Plaintiff's Complaint, during Rodrigues tenure as Secretary, the Virginia Applications Program ("VEAP"), a division of the Virginia Information Technology Agency ("VITA"), entered into a business partnership with SBE to provide support services for the Virginia Election and Registration Information System. (*Id.* at ¶¶ 15–16, 19). As part of this business relationship, Plaintiff alleges that Paul Stenjborn ("Stenjborn"), a VEAP employee, worked closely with the SBE, and "enjoyed a close personal relationship with Rodrigues." (*Id.* at ¶ 18.) At some time prior to October

2

2009, Rodrigues allegedly "expressed to a number of employees that she had to get Stenjborn out of VEAP because he was not happy there." (*Id.*)

Later in October of 2009, Plaintiff asserts that Stenjborn approached her and requested a copy of the pricing schedule for an SBE contract with the vendor Quest Information Systems. (*Id.* at ¶ 19). According to Plaintiff, the contract with this particular vendor contained an "Optional Services" provision, allowing SBE to procure certain services not otherwise included in the contract at an hourly rate. (*Id.* at ¶ 20.) At the time Plaintiff furnished the requested pricing schedule to Stenjborn, she was unaware that he had resigned from VEAP and started his own company, Election Information Services ("EIS"), in New Mexico. (*Id.* at ¶ 22.) Combining the newly acquired pricing schedule with his knowledge of the Quest contract from his work with VEAP, Plaintiff alleges that Stenjborn submitted a proposal undercutting Quest on an "Optional Services" provision of the vendor contract. (*Id.* at ¶¶ 20–24).

Upon receipt of Stenjborn's proposal, Rodrigues allegedly awarded the optional services contract to EIS as a "sole source contract," without considering any competing bids. (*Id.* at ¶ 26.) According to Plaintiff, this violated proper procurement procedures, which required Rodrigues to solicit input from SBE staff and SBE's business manager before making any award. (*Id.*)

After learning of the contract awarded to EIS, Plaintiff claims that she contacted her supervisor, Wilson, to express her concerns regarding the procurement procedure. (*Id.* at ¶ 27.) Specifically, Plaintiff advised him that the contract was not procured using one of the Commonwealth's procurement procedures, constituting a violation of the

3

Virginia Public Procurement Act. (*Id.*) Wilson in turn communicated Plaintiff's concerns, including alleged violations of ethical considerations and public procurement, to Rodrigues. (*Id.* at ¶ 29.) Plaintiff asserts that Rodrigues defended her sole source award on the grounds that "any vendor providing this type of service to SBE should have knowledge of Virginia's election laws." (*Id.* at ¶ 31.) According to Plaintiff, Rodrigues' explanation struck her as inconsistent with SBE practices because "[Rodrigues] knew that the SBE currently employed two contractors ... [through VITA that had no] prior knowledge of Virginia's election laws." (*Id.* at ¶ 32.)

In November 2009, complaints were made to the Commonwealth's Fraud, Waste and Abuse Hotline regarding the Stenjborn contract, resulting in an official investigation by the Commonwealth. (*Id.* at ¶¶ 34–35.)[1] When Rodrigues became aware of the investigation, she allegedly instructed Plaintiff "not to talk with anyone ..." as "all information provided during a Hotline Investigation was confidential." (*Id.* at ¶¶ 41–42.) Plaintiff asserts that she construed Rodrigues' instruction as "a veiled threat that she should not cooperate or give any information to the investigators." (*Id.* at ¶¶ 43–44.) Then, in February 2010, Rodrigues sent Plaintiff an email relieving her of responsibility as SBE's Leave Coordinator. Rodrigues purportedly made this personnel decision without consulting with Plaintiff or her superior. (*Id.* at ¶ 46.)

---

[1] The Complaint does not explicitly specify who placed the Hotline complaints (Compl. at ¶ 36.) However, Plaintiff subsequently claims that she "directed her concerns to The State Employee Fraud, Waste and Abuse Hotline." (Pl.'s Resp. to Def.'s Partial Mot. to Dismiss [hereinafter "Pl.'s Resp."] at 6.)

4

On March 8, 2010, a State Internal Auditor concluded the investigation and issued a report regarding the Stenjborn contract. In Plaintiff's opinion the report concluded: (1) "that Rodrigues 'did not [follow] State policy [in soliciting the contract] because SBE did not involve VITA and obtain its agreement and approval [that the contract] qualified as a sole source procurement, although required to do so[;]'" (2) "that Rodrigues 'likely violated the VPPA ... [and] it is unlikely that this contract would've qualified as a sole source procurement;'" and (3) that there may be violations of VITA security standards if EIS accessed agency data without authorization. (*Id.* at ¶¶ 50–52.) Plaintiff contends that the report "supported [the] concerns . . . that she had earlier communicated to Rodrigues[]" and "impugned Rodrigues' integrity, competency and impartiality, which reflected poorly on her . . . ." (*Id.* at ¶¶ 53–54.)

In response to the conclusions drawn by the report, Rodrigues allegedly requested that Plaintiff explain her "assessments and comments regarding the procurement issues related to the [Stenjborn] contract . . . ." Plaintiff claims that she emailed her assessments and comments to Rodrigues on April 6, 2010. (*Id.* at ¶ 55.) According to Plaintiff, Rodrigues used this email to confirm her suspicions that Plaintiff participated in the investigation. (*Id.* at ¶ 57.) On April 22, 2010, Rodrigues informed Plaintiff that as a result of restructuring, her position would be eliminated. (*Id.* at ¶¶ 59–61.) Furthermore, according to Rodrigues, Plaintiff would be ineligible for any placement opportunity under the state layoff policy. According to Plaintiff, Rodrigues claimed that her actions were a direct result of the Governor's directive to "consolidate the agency's procurement functions within the Department of General Services." (*Id.* at ¶ 63.) However, Plaintiff

alleges that SBE had previously indicated that it was hiring additional employees to "handle the increased workload." (*Id.* at ¶ 58.)

Plaintiff claims that the abolishment of her position "was a pretext in order to camouflage the real reason for her termination," her participation in the investigation resulting in "a report that was extremely unfavorable to Rodrigues." (*Id.* at ¶ 65.) Additionally, Plaintiff alleges that "the only employees selected for layoff because of consolidation[, including herself] were African Americans." (*Id.* at ¶ 66.) According to Plaintiff, Rodrigues chose not to undertake certain other cost-cutting measures, because doing so would have required Rodrigues to terminate white employees or contractors. (*Id.* at ¶ 66–67.) Specifically, Plaintiff claims that Rodrigues opted not to terminate SBE's Information Services division, despite an estimated annual savings of $872,000, because she did not want to lay off the white Information Services Manager or discontinue the EIS contract, a detriment to Stenjborn who is also white. (*Id.* at ¶ 67.)

Based on the foregoing allegations, Plaintiff filed a five-count Complaint against Defendants Rodrigues and SBE (collectively referred to as "Defendants") in this Court on December 28, 2011. In Count I, Plaintiff alleges that her discharge constituted an adverse employment action that violated Title VII of the Civil Rights Act. In Count II, Plaintiff claims that she was the victim of race discrimination, a violation of 42 U.S.C. §§ 1981 and 1983. Plaintiff's third Count alleges that Defendants violated both Federal and Virginia whistleblower statutes by terminating her in response to the complaints she filed. In Count IV Plaintiff claims that her statements were protected under the First Amendment. Finally, in Count V, Plaintiff asserts a *Bowman* claim for wrongful

6

discharge arguing that Defendants violated Virginia public policy by terminating her for actions aimed at protecting the public through opposition to an illegal contract. In response, the Defendants filed the instant partial Motion to Dismiss pursuant to Rule 12(b)(6).

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint.... [I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and

7

common sense." *Francis*, 588 F.3d at 193. The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950; *see also Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

### III. ANALYSIS

In their partial Motion to Dismiss, the Defendants move to dismiss Plaintiff's retaliation claim in Count I of the Complaint as to both parties contending that she has failed to allege that she opposed any practice prohibited by Title VII. Defendants also move to dismiss Plaintiff's allegation of racial discrimination in Count II of the Complaint as to SBE. Additionally, Defendants move to dismiss the alleged violations of federal and state whistleblower laws (Count III), the First Amendment (Count IV), and Virginia public policy (Count V), as to both Defendants. Plaintiff concedes that she has failed to state a claim for retaliation under Title VII as alleged in Count I of the Complaint. Therefore, as the parties have agreed that Count I should be dismissed, it will be dismissed without prejudice. Plaintiff also concedes that the claim against SBE for race discrimination in Count II is barred by the Eleventh Amendment. Accordingly, this claim will also be dismissed with prejudice. Finally, Plaintiff admits that Virginia's Whistleblower Protection Act was not amended to waive sovereign immunity until 2011 and cannot be retroactively applied. Therefore, Plaintiff's claim under Virginia's Whistleblower Protection Act in Count III of the Complaint must also be dismissed. The Court will address the remaining arguments in sequence.

*A.*

Turning first to the alleged violation of the federal whistleblower statute, Defendants assert that Plaintiff's claim must fail as a matter of law because the statute only applies to federal employees and agencies. The federal Whistleblower Protection Act ("WPA"), prohibits authorized employees of federal agencies from making personnel decisions based on "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences-- (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, if such disclosure is not prohibited by law." 5 U.S.C. § 2302. According to the express terms of the statute, the WPA applies only to federal employees. *See* 5 U.S.C. § 2105; *see also Ho v. United States*, 49 Fed. Cl. 96, 106 (2001). Similarly, the term "agencies" as defined by the statute refers only to "an Executive agency and the Government Printing Office." 5 U.S.C. § 2302(a)(2)(C).

In her response, Plaintiff concedes that the SBE is not an agency as defined in 5 U.S.C. § 2302. (Pl.'s Resp. at 2.) Nevertheless, she argues that "given the fact that a vast majority of the funds spent by the SBE are derived from federal grants, . . . there is case law which supports the application of the federal nexus test" and consequently, the application of the WPA to her case. (*Id.*) The single Fourth Circuit case cited by Plaintiff in support of this argument, however, does not remotely reference the WPA.[2]

---

[2] In support of her theory, Plaintiff cites *United States v. Jackson*, No. 09-4753 (4th Cir. 2010), a case involving the application of 18 U.S.C. § 1001 to a subcontractor. Section 1001(a) makes it

9

Nor can this Court find any additional authority for Plaintiff's strained theory. For this reason Plaintiff's claim under the WPA in Count III must be dismissed.

### B.

Turning next to Plaintiff's First Amendment claim, Defendants urge the Court to dismiss this portion of the Complaint because Plaintiff's alleged "speech" was not made by her as a citizen on a matter of public concern, and is therefore not protected by the First Amendment.

In general, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951 (2006). As is the case in the private sector, government employers require considerable latitude to regulate their employees' words and actions. *Id.* at 418. This enables government employers to prevent employees from expressing views that may contravene government policies, release sensitive information, or otherwise impair the proper performance of governmental functions. *Id.* at 419.

At the same time, however, "a citizen who works for the government is nonetheless a citizen," and the Supreme Court has made clear that "public employees do not surrender all their First Amendment rights by reason of their employment. Rather the First Amendment protects a public employee's right, in certain circumstances, to speak as

---

crime to knowingly and willfully make a materially false, fictitious, or fraudulent statement or representation "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." The Fourth Circuit interpreted the term "jurisdiction" broadly, and applied the statute to an employee for a subcontracting company. *Jackson*, No. 09-4753 at 5–6.

a citizen addressing matters of public concern." *Id.* at 417 (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S. Ct. 1731 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983).

As stated by the Supreme Court in *Garcetti*, two inquiries guide the scope of the constitutional protections accorded to public employee speech. The first inquiry requires the Court to determine "whether the employee spoke as a citizen on a matter of public concern." *Id.* at 418. If the answer is no, that ends the inquiry. If the answer is yes, the Court must ask "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citing *Pickering*, 391 U.S. at 568, 88 S. Ct. 1731). This second consideration addresses the significance between the employee's expression and employment, wherein the Court has made clear that a government employer's restrictions "must be directed at speech that has some potential to affect the entity's operations." *Id.*

Within this First Amendment jurisprudence, the Court has noted the additional "importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Id.* at 419. Indeed, "[w]ere [public employees] not able to speak on [their employers' operations], the community would be deprived of informed opinions on the important public issues." *San Diego v. Roe*, 543 U.S. 77, 82, 125 S. Ct. 521 (2004). The interest at stake is, therefore, "as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.*

11

Here, Defendants contend that Plaintiff's speech "took place pursuant to her official duties as the SBE's contracts and services coordinator" rather than as a citizen. (Mem. Law Supp. Defs.' Partial Mot. Dismiss at 8–9.) "Whether speech is that of a private citizen addressing a matter of public concern is a question of law for the court," *Urofsky v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir. 2000), which must be determined by looking at "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S. Ct. 1684 (1983); *see also Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684) ("To determine whether speech involves a matter of public concern, [the court must] examine the content, form, and context of the speech at issue in light of the entire record."). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby*, 388 F.3d at 446 (citing *Connick*, 461 U.S. at 146, 103 S. Ct. 1684); *see also City of San Diego*, 543 U.S. at 83–84, 125 S. Ct. 521 (observing that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication"). For example, speech that "seek[s] to bring to light actual or potential wrongdoing or breach of public trust" generally implicates matters of public concern. *Connick*, 461 U.S. at 493. In conducting this inquiry, "it does not matter 'how interesting or important the subject of an employee's speech is,' and 'the place where the speech occurs is [also] irrelevant.'" *Adams v. Trustees of the University of N.C.-Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011) (quoting *Urofsky*, 216 F.3d at 407).

According to Plaintiff's Complaint, after learning of the contract awarded to Stenjborn she "expressed serious reservations and concerns to her supervisor," (Compl. at ¶ 27) and directed a complaint to the "Fraud, Waste and Abuse Hotline regarding the award." (*Id.* at ¶ 34.)[3] As a result of the complaint to the Hotline, the Commonwealth's fraud investigators allegedly launched an investigation into the matter. This investigation culminated in a report which, according to Plaintiff, corroborated her complaint. (*Id.* at ¶ 35–54.) Plaintiff also alleges that after the report was disseminated, she sent an e-mail to Rodrigues with "her assessments and comments regarding the procurement issues related to the EIS contract." (*Id.* at ¶ 55.) Because the response mirrored the information in the Hotline report, Plaintiff asserts that Rodrigues used this email "to confirm her suspicions that [Plaintiff] participated in the Hotline investigation." (*Id.* at ¶ 56–57.) A few weeks later, Rodrigues, along with Human Resources personnel, informed Plaintiff that she was going to be laid off as a result of restructuring.

Accepting these allegations as true and viewing them in the light most favorable to Plaintiff, at this stage in the litigation the Complaint has sufficiently alleged that Plaintiff spoke at least in part as a private citizen about matters of public concern. First, Plaintiff's use of the fraud Hotline indicates that she was not acting pursuant to her official duties as a contracts and services coordinator, but was instead speaking as a private citizen.

---

[3] The Complaint merely states that "complaints were made to the Fraud, Waste and Abuse Hotline;" however, in her Response to Defendants' Motion to Dismiss, Plaintiff clarifies that she in fact placed the call to the state employee hotline. According to her Response, the Hotline is a "toll-free telephone number 'hotline' to encourage state employees to report situations where fraud, waste, or abuse may have occurred in Virginia Executive Branch Agencies and Institutions." (Pl.'s Resp. at 6.) At this stage of the litigation, viewing all factual allegations in the light most favorable to the plaintiff, the Court construes the Complaint as alleging that Plaintiff placed the call to the Hotline.

13

Furthermore, the content of Plaintiff's alleged statements regarding Rodrigues's failure to follow procurement procedures as set forth in the Virginia Public Procurement Act appears to implicate a matter of public concern. Insomuch as the public expects the fair and impartial award of government contracts, Plaintiff's alleged speech involves the "wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148, 103 S. Ct. 1684. For these reasons, the Court must deny Defendant's Motion to Dismiss the First Amendment claim.

## C.

The Court turns finally to Plaintiff's claim that her termination violates Virginia public policy. In their Motion to Dismiss, Defendants contend that Plaintiff has failed to identify any specific public policy giving rise to an actionable discharge. Furthermore, according to Defendants the claim is barred under the doctrine of sovereign immunity because Plaintiff failed to comply with the notice requirements of the Virginia Tort Claims Acts.

In general, Virginia adheres to the common law doctrine of at-will employment, wherein either party may terminate employment at any time and for any reason. *See Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 710–11 (Va. 2002). However, in a line of cases beginning with *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797, 801 (Va. 1985),[4] the Virginia Supreme Court carved out a "narrow exception" to this rule

---

[4] In *Bowman*, several employees were discharged because they refused to vote shares of stock in the manner directed by the employer, in spite of a statue providing shareholders with the right to

14

(Va. 2000). Indeed, "in only three circumstances have [Virginia courts] concluded that the claims were sufficient to constitute a common law action for wrongful discharge under the public policy exception." *Id.* First, in *Bowman*, the court recognized a right of action where an employee's termination violated a public policy enabling the exercise of an employee's statutorily created right. 331 S.E.2d 797. Virginia courts have "also allowed such an action to proceed when the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *Rowan*, 559 S.E.2d at 711 (citing *Bailey v. Scott-Gallaher, Inc.*, 480 S.E.2d 502 (Va. 1997); *Lockhart v. Commonwealth Education Systems Corporation*, 439 S.E.2d 328 (1994)). Finally, the Virginia courts "have recognized a cause of action for wrongful discharge where the discharge was based on the employee's refusal to engage in a criminal act." *Id.*[5]

Here, Plaintiff merely asserts that the State Employee Fraud, Waste, and Abuse Hotline—created pursuant to a state Executive Order—embodies the relevant public policy giving rise to her *Bowman* claim. According to Plaintiff, the Hotline's purpose of identifying and eliminating instances of fraud, waste, or abuse within state agencies provides a sufficient public policy to support her claim. Plaintiff, however, has failed to provide sufficient facts to evidence that she is entitled to any relief under *Bowman* and its

---

[5] In recognizing this claim, the Virginia court stated that "although criminal statutes do not contain explicit statements of public policy, the protection of the general public from lawless acts is an unquestioned policy underlying such statutes." *Rowan*, 559 S.E.2d at 711. Indeed, "allowing the employment-at-will doctrine to 'serve as a shield for employers who seek to force their employees, under the threat of discharge, to engage in criminal activity' would violate this most compelling public policy." *Id.* (quoting *Mitchem v. Counts*, S.E.2d 246, 252 (Va. 2000).

16

allowing an at-will employee to bring a tortious wrongful discharge claim if the termination violates Virginia public policy as set forth in a Virginia statute. *See Rowan*, 559 S.E.2d at 709; *see also Torabipour, et al. v. Cosi, Inc.*, 2012 WL 2153168, *5 (Jun. 12, 2012).

As a threshold matter, a plaintiff attempting to assert a "*Bowman* claim" must identify a Virginia statute that the employer-defendant violated by terminating the plaintiff. *Storey v. Patient First Corp.*, 207 F.Supp.2d 431, 450 (E.D. Va. 2002) (citing *Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806 (Va. 1996); *Warner v. Buck Creek Nursery, Inc.*, 149 F.Supp.2d 246, 261 (W.D.Va. 2001); *Perry v. American Home Products Corp.*, 1997 WL 109658, at *4 (E.D. Va. Mar. 4, 1997)). Moreover, it is important to emphasize that such a claim "must find root in a state statute," rather than any act of Congress. *McCarthy v. Texas Instruments, Inc.*, 999 F.Supp. 823, 829 (E.D. Va.1998); *see also Oakley v. The May Department Stores, Co.*, 17 F.Supp.2d 533, 536 (E.D. Va. 1998) (explaining that "Title VII [of Civil Rights Act of 1964] cannot be used to support a *Bowman* claim, because the Bowman exception ... is predicated on public policies derived from Virginia statutes, not federal laws.") (citations omitted).

In considering post-*Bowman* cases, the Virginia courts have consistently construed this exception very narrowly. *See City of Virginia Beach v. Harris*, 523 S.E.2d 239, 245

---

vote their shares. The court concluded that to fully realize the public policy underlying the shareholders' statutory right, shareholders had to be allowed to vote their shares free from duress or intimidation. Therefore, the employer's actions in discharging the employees violated the public policy that shareholders are entitled to vote their shares free of duress or intimidation reflected in the right conferred on the shareholder/employee by the statute. *Bowman*, 331 S.E.2d at 801.

15

progeny. Both Plaintiff's Complaint and her response to the Motion to Dismiss fail to allege that her termination was related to her exercise of a statutorily created right. Nor does she argue that Defendants violated a public policy explicitly expressed in a statute, where she was clearly a member of a protected class enunciated by the public policy.[6] Indeed, her Complaint fails to identify any Virginia statute at all. Finally, Plaintiff does not allege that her discharge was a result of her failure to engage in criminal conduct.

Therefore, absent the invocation of a Virginia statute, Plaintiff has failed to meet the threshold requirement for asserting a claim under Virginia law. For these reasons Plaintiff's claim that her termination violates Virginia public policy must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss will be granted in part and denied in part. Defendants' Motion will be granted as to Plaintiff's claim for retaliatory discharge (Count I). Defendants' Motion to Dismiss Plaintiff's claim for race discrimination (Count II) against the SBE will also be granted. Defendants' Motion will also be granted as to the claims for violations of Virginia and Federal Whistleblower laws (Count III) and Virginia public policy (Count V). Defendants Motion to Dismiss

---

[6] The Court notes that Virginia's Whistleblower Protection Act, now provides the statutory protection Plaintiff seeks. However, as Plaintiff has already conceded, the Act did not apply at the time of the incident, and Virginia courts have expressly refused to recognize a general common-law "whistleblower" retaliatory discharge claim. *See Dray v. New Market Poultry Products, Inc.*, 518 S.E.2d 312, 113 (1999) (citing *Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806 (1996); *Miller v. SEVAMP Inc.*, 362 S.E.2d 915 (1987)).

Plaintiff's claim for violation of the First Amendment (Count IV) will be denied. An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: July 13, 2012
Richmond, VA